No. 23-1931

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

BAY MILLS INDIAN COMMUNITY, GRAND TRAVERSE BAND OF OTTAWA AND
CHIPPEWA INDIANS, LITTLE RIVER BAND OF OTTAWA INDIANS, LITTLE TRAVERSE
BAY BANDS OF ODAWA INDIANS,
*Plaintiff-Intervenors-Appellees,*
and

SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS,
*Plaintiff-Intervenor-Appellant,*
v.

STATE OF MICHIGAN, *et al.,*
*Defendants-Appellees.*

---

Appeal from the United States District Court for the Western District of Michigan,
Northern Division, Case No. 2:73-cv-26-PLM
Honorable Paul. L. Maloney

---

**OPENING BRIEF OF PLAINTIFF-INTERVENOR-APPELLANT
SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS**

Ryan J. Mills
Sault Ste. Marie Tribe of Chippewa Indians
523 Ashmun St.
Sault Ste. Marie, MI 49783
906-635-6050
Email: rmills@saulttribe.net
*Counsel for Plaintiff-Intervenor-Appellant*
*Sault Ste. Marie Tribe of Chippewa Indians*

## **CORPORATE DISCLOSURE**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, counsel for Plaintiff-Intervenor-Appellant Sault Ste. Marie Tribe of Chippewa Indians ("Sault Tribe") certifies that it has no parent corporation and no publicly held corporation owns 10% or more of its stock. Sault Tribe is a federally recognized Indian tribal government.

DATED: April 3, 2024

/s/ *Ryan J. Mills*
Ryan J. Mills
Attorney at Law
Sault Ste. Marie Tribe of Chippewa Indians
523 Ashmun St.
Sault Ste. Marie, MI 49783
906-635-6050
Email: rmills@saulttribe.net

i

# TABLE OF CONTENTS

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................1

JURISDICTIONAL STATEMENT ........................................................2

STATEMENT OF ISSUES ..............................................................3

INTRODUCTION ....................................................................4

STATEMENT OF THE CASE ...........................................................5

•  The State of Michigan unlawfully interfered with Tribal Treaty rights..........6

•  The parties entered into a consent decree in 1985 to protect against the State's overfishing and lack of cooperation...........................................8

•  The parties agreed to enter into a new Consent Decree in 2000. .................10

•  After the other parties excluded Sault Tribe from negotiations for a new consent decree in 2022, the District Court entered the 2023 Decree over Sault Tribe's objections and without a trial or evidentiary hearing.................................11

•  The 2023 Decree—to which Sault Tribe objected—significantly restricts the Tribes' exercise of their Treaty rights and does not impose similarly restrictive conditions on the *Defendant* State. ..........................................................14

SUMMARY OF ARGUMENT ...........................................................17

ARGUMENT .......................................................................19

I.   The District Court legally erred by imposing the 2023 Decree on Sault Tribe without its consent and without applying the standard for injunctive relief. 19

  A.   The 2023 Decree is not a consent decree because it imposes obligations and restrictions on Sault Tribe without its consent. .........19

  B.   The 2023 Decree is a permanent injunction improperly imposed on Sault Tribe. ..................................................................21

  C.   The 15 considerations applied by the District Court are inapplicable. ..................................................................23

  D.   The District Court abused its discretion by improperly enjoining Sault Tribe without requiring the moving parties to satisfy the standard for injunctive relief.................................................................24

II.  Even if the 2023 Decree were construed as a consent decree, the District Court abused its discretion in entering the 2023 Decree.............................28

A.  The District Court abused its discretion by entering the 2023 Decree, which improperly limits Sault Tribe's exercise of its treaty rights, over Sault Tribe's objection and without holding a trial .............................29

B.  The District Court abused its discretion by entering the 2023 Decree because it does not further the objectives of the law on which the complaint is based. ...............................................................................33

C.  The District Court abused its discretion by entering the 2023 Decree because it primarily imposes obligations on the Plaintiff Tribes absent any violation of the United States Constitution or federal law by the Tribes. .................................................................................................34

D.  The District Court abused its discretion by entering the 2023 Decree because it improperly deprives the parties of their sovereign legislative and executive powers ..........................................................37

III.  The District Court abused its discretion by indefinitely extending the 2000 Consent Decree. ..........................................................................................41

A.  The District Court did not hold the required evidentiary hearing or make the required factual findings. .....................................................43

B.  Neither the movants nor the District Court applied the standard necessary to extend the 2000 Consent Decree. ...................................44

C.  An indefinite extension of the 2000 Consent Decree wreaks havoc on the parties' bargain, contrary to established law. .................................46

D.  An indefinite extension of a consent decree without the consent of all parties and absent a lack of compliance with the consent decree is unprecedented .....................................................................................49

E.  A consent decree binding Sault Tribe is no longer equitable. ............50

i.  The 2000 Consent Decree did not remedy any violation of federal law. ...............................................................................51

ii.  Sault Tribe had fulfilled any objectives of the 2000 Consent Decree and responsibility for regulating its own Treaty fishing activities should have been returned to it ...................................51

CONCLUSION ......................................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Armco, Inc. v. United Steelworkers of Am.*,
  280 F.3d 669 (6th Cir. 2002) ...............................................................2

*Audi AG v. D'Amato*,
  469 F.3d 534 (6th Cir. 2006) .......................................................25, 26

*California v. Cabazon Band of Mission Indians*,
  480 U.S. 202 (1987)..........................................................................40

*Capital City Gas Co. v. Phillips Petro. Co.*,
  373 F.2d 128 (2d Cir. 1967) .............................................................22

*Chicago Title Ins. Corp. v. Magnuson*,
  487 F.3d 985 (6th Cir. 2007) ............................................................25

*Clark v. Coye*,
  60 F.3d 600 (9th Cir. 1995) ..............................................................35

*Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*,
  669 F.3d. 737 (6th Cir. 2012) .....................................................35, 50

*David C. v. Leavitt*,
  242 F.3d 1206 (10th Cir. 2001) ........................................................49

*Doe v. Briley*,
  562 F.3d 777 (6th Cir. 2009) ............................................................37

*E.E.O.C. v. Local 40 Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*,
  76 F.3d 76 (2d Cir. 1996) ...........................................................47, 48

*East Brooks Books, Inc. v. City of Memphis*,
  633 F.3d 459 (6th Cir. 2011) ............................................................44

*Evans v. City of Chicago*,
  10 F.3d 474 (7th Cir. 1993) (en banc) ..............................................37

*Frew v. Hawkins*,
  540 U.S. 431 (2004)................................................................32, 37, 38

*Ghandi v. Police Dept. of City of Detroit*,
  747 F.2d 338 (6th Cir. 1984) ...................................................25, 26

*Heath v. DeCourcy*,
  992 F.2d 630 (6th Cir. 1993) ............................................................43

*Holland v. N.J. Dep't of Corr.*,
  246 F.3d 267 (3rd Cir. 2001) ...........................................................42

*Honeywell, Inc. v. Brewer-Garrett Co.*,
  145 F.3d 1331, 1998 WL 152951 (6th Cir. 1998) (unpublished)......................25

*Horne v. Flores*,
  557 U.S. 433 (2009)....................................................................34, 37

*Howe v. City of Akron*,
  801 F.3d 718 (6th Cir. 2015) ....................................................24, 25

*Iowa Mut. Ins. Co. v. LaPlante*,
  480 U.S. 9 (1987)............................................................................40

*Jackson v. Los Lunas Cmty. Prog.*,
  880 F.3d 1176 (10th Cir. 2018) ........................................................34

*James v. City of Detroit*,
  Nos. 20-1805/21-1053, 2021 WL 5463778 (6th Cir. Nov. 23, 2021) ............................................................................................41

*John B. v. Emkes*,
  710 F.3d 394 (6th Cir. 2013) ...............................................34, 38, 50

*Juan F. v. Weicker*,
  37 F.3d 874 (2d Cir. 1994) ........................................................44, 45

*Lac Courte Oreilles Band v. Wisconsin*,
  668 F. Supp. 1233 (W.D. Wis. 1987) .................................................39

*Local No. 93, Intern. Ass'n of Firefighters v. City of Cleveland*,
  478 U.S. 501 (1986)......................................................19, 20, 21, 29

*Lorain NAACP v. Lorain Bd. of Educ.*,
   979 F.2d 1141 (6th Cir. 1992) .............................................................2, 20, 35, 41

*McCarthy v. Ameritech Pub., Inc.*,
   763 F.3d 488 (6th Cir. 2014) ...................................................................25

*Mille Lacs Band of Chippewa Indians v. Minnesota*,
   952 F. Supp. 1362 (D. Minn. 1997), *aff'd*, 124 F.3d 904 (8th Cir.
   1997), *aff'd*, 526 U.S. 172 (1999)...........................................................39

*Milliken v. Bradley*,
   433 U.S. 267 (1977)...................................................................................37

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)...................................................................................25

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)...................................................................................35

*Nken v. Holder*,
   556 U.S. 418 (2009)...................................................................................22

*Northeast Ohio Coalition for the Homeless v. Husted*,
   No. 2:06-CV-896, 2017 WL 1531811, at *2 (S.D. Ohio Apr. 28,
   2017) .....................................................................................................46, 47

*Patio Enclosures, Inc. v. Herbst*,
   39 F. App'x 964 (6th Cir. 2002) (unpublished)....................................25

*People v. LeBlanc*,
   248 N.W.2d 199 (Mich. 1976).....................................................................5

*People Who Care v. Rockford Bd. of Educ.*,
   964 F.2d 639 (7th Cir. 1992) ....................................................................19

*Reynolds v. Roberts*,
   251 F.3d 1350 (11th Cir. 2001) ..........................................................19, 27

*Rufo v. Inmates of Suffolk Cty. Jail*,
   502 U.S. 367 (1992)............................................................................34, 44

*Sec'y of Lab. v. 3Re.com, Inc.*,
   317 F.3d 534 (6th Cir. 2003) ...................................................................24

*Settler v. Lameer*,
    507 F.2d 231 (9th Cir. 1974) ............................................................38

*Thompson v. United States Department of Housing & Urban Development*,
    404 F.3d 821 (4th Cir. 2005) ...........................................................49

*Union Home Mortg. Corp. v. Cromer*,
    31 F.4th 356 (6th Cir. 2022) ............................................................35

*United States v. City of Hialeah*,
    140 F.3d 968 (11th Cir. 1998) ....................................................29, 30

*United States v. City of Miami*,
    664 F.2d 435 (5th Cir. 1981) (per curiam) ................................*passim*

*United States v. Junction City Sch. Dist.*,
    14 F.4th 658 (8th Cir. 2021) ............................................................34

*United States v. Michigan*,
    12 I.L.R. 3079, 3080 (W.D. Mich. 1985) ...........................9, 23, 31

*United States v. Michigan (Michigan I)*,
    471 F.Supp. 192 (W.D. Mich. 1979) ..........................................*passim*

*United States v. Michigan*,
    534 F.Supp. 668 (W.D. Mich. 1982) ...................................................7

*United States v. Michigan*,
    68 F.4th 1021 (2023) ..................................................................17, 29

*United States v. Michigan (Michigan II)*,
    653 F.2d 277 (6th Cir. 1981) ......................................................*passim*

*United States v. Ward Baking Co.*,
    376 U.S. 327 (1964).........................................................................30

*United States v. Washington*,
    384 F. Supp. 312 (W.D. Wash. 1974) ...............................................39

*United States v. Wayne Cty.*,
    95 F. App'x 809 (6th Cir. 2004) (unpublished).................................43

*United States v. Wheeler*,
  435 U.S. 313 (1978)..................................................................................38

*Vanguards of Cleveland v. City of Cleveland*,
  23 F.3d 1013 (6th Cir. 1994) ...........................................................*passim*

*White v. Alabama*,
  74 F.3d 1058 (11th Cir. 1996) .....................................................19, 29

*Williams v. Vukovich*,
  720 F.2d 909 (6th Cir. 1983) ............................................................*passim*

## STATUTES

28 U.S.C. § 1291 ..............................................................................................2

28 U.S.C. § 1292(a)(1).....................................................................................2

28 U.S.C. § 1331 ..............................................................................................2

28 U.S.C. § 1345 ..............................................................................................2

28 U.S.C. § 1362 ..............................................................................................2

## OTHER AUTHORITIES

Sixth Circuit Rule 34(a) ..................................................................................1

Defendant Michigan Department of Natural Resources' 2023
  Michigan Fishing Guide at 71, https://www.michigan.gov/dnr/-
  /media/Project/Websites/dnr/Documents /LED/digests/2023_ ..........................16

Douglas Laycock, *Consent Decrees Without Consent: The Rights of
  Nonconsenting Third Parties*, 1987 U. Chi. Legal F. 103, 144
  (1987) ..............................................................................................19

Fed. R. App. P. 4(a)(1)(B) ..............................................................................3

Fed. R. App. P. 32(a)(5) ..................................................................................54

Fed. R. App. P. 32(a)(6) ..................................................................................54

Fed. R. App. P. 32(a)(7)(B) ............................................................................54

Fed. R. App. P. 32(f) ................................................................54

Fed. R. App. P. 34(a) ................................................................1

Fed. R. Civ. P. 16 ....................................................................12

*Injunction*, Black's Law Dictionary (11th ed. 2019) ...............22

*Permanent Injunction*, Black's Law Dictionary (11th ed. 2019) ...........21

Smith *et al*., Fishery Statistical Districts of the Great Lakes (1961),
  http://www.glfc.org/pubs/TechReports/Tr02.pdf ....................8

U.S. Const. art. VI, § 2 .......................................................4, 50

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Sixth Circuit Rule 34(a), Sault Tribe respectfully requests oral argument in this appeal. This appeal raises novel and important issues about the impropriety of trial court orders that impose consent decrees (or similar decrees) on parties without their consent, particularly when, as here, those parties are sovereign governments. This case is especially remarkable because it is a treaty rights case, not an institutional reform case, and the decree restrains the *plaintiff tribes* in the exercise of their adjudicated treaty rights, absent any alleged or proven fault on their part. This raises Constitutional questions about whether, how, and under what circumstances a federal district court may restrain a sovereign tribal government's exercise of its Constitutionally protected treaty rights. Oral argument will assist the Court in determining these important issues regarding the interplay and boundaries between judicial oversight of, and interference with, fundamental tribal sovereignty and treaty rights.

# JURISDICTIONAL STATEMENT

The United States and intervening Indian tribes brought this action to restrain the State of Michigan from interfering with the tribes' exercise of their treaty fishing rights. *United States v. Michigan*, 471 F.Supp. 192, 203 (W.D. Mich. 1979). The District Court exercised jurisdiction pursuant to 28 U.S.C. §§ 1331 (action arising under the Constitution, laws, or treaties of the United States), 1345 (United States as plaintiff), and 1362 (action brought by Indian tribe when controversy arises under the Constitution, laws, or treaties of the United States). *Id.* at 217. The District Court retained its jurisdiction over the case indefinitely in its 1979 decision. *Id.* at 281.

This Court has appellate jurisdiction to review the District Court's entry of its 2023 Great Lakes Fishing Decree, R. 2130-2132, under 28 U.S.C. § 1292(a)(1) because it constitutes an injunction.[1] *Armco, Inc. v. United Steelworkers of Am.*, 280 F.3d 669, 678 (6th Cir. 2002). This Court also has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) to review the District Court's extension (*i.e.*, modification), Order, R. 2027, of the 2000 Consent Decree, R. 1458. *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1147 (6th Cir. 1992).

---

[1] *See* Part I.B, below. Even if the Decree were construed as a consent decree, a consent decree is a final judicial order, *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983), so this Court would have jurisdiction pursuant to 28 U.S.C. § 1291.

On November 14, 2022, the District Court entered an Order indefinitely extending the 2000 Consent Decree in this case. Order, R. 2027. Sault Tribe timely filed a Motion for reconsideration on December 12, 2022. Motion, R. 2046. On August 24, 2023, the District Court entered an Order adopting the 2023 Great Lakes Fishing Decree and dismissing as moot Sault Tribe's Motion for reconsideration of the indefinite extension of the 2000 Consent Decree. Order, R. 2131. Sault Tribe timely filed a Notice of Appeal of that Order on October 16, 2023. Fed. R. App. P. 4(a)(1)(B); Notice, R. 2138.

## STATEMENT OF ISSUES

1. Whether the District Court legally erred by entering its 2023 Great Lakes Fishing Decree, which imposes restrictions and obligations on Sault Tribe's exercise of its treaty rights, without Sault Tribe's consent and without adjudicating whether injunctive relief was appropriate.

2. If the 2023 Great Lakes Fishing Decree were construed as a consent decree, whether the District Court abused its discretion by entering that Decree without holding a trial to resolve Sault Tribe's objections to the Decree.

3. Whether the District Court abused its discretion by entering its 2023 Great Lakes Fishing Decree when the Decree: (a) does not further the objectives of the law on which the plaintiffs' complaint is based; (b) primarily imposes obligations on the tribal Plaintiffs absent any violation of the United States

3

Constitution or federal law by them; and (c) improperly deprives the parties of their sovereign legislative and executive powers.

4.  If the District Court erred in entering its 2023 Great Lakes Fishing Decree, whether it also abused its discretion by indefinitely extending the 2000 Consent Decree without holding the required hearing, making the required findings of fact, applying the stringent standard for modification of a consent decree, or addressing several serious problems with an indefinite extension.

## INTRODUCTION

Treaties are the supreme law of the land. U.S. CONST. art. VI, § 2. And Sault Tribe's treaty rights, affirmed by this Court, are of paramount importance to Sault Tribe. Yet the District Court in this case *twice* imposed extensive restrictions on Sault Tribe's exercise of its treaty rights without Sault Tribe's consent, without any alleged or proven wrongdoing on Sault Tribe's part, and without applying the correct legal standards or adjudicating the merits. First, the District Court improperly granted an indefinite extension of the 2000 Consent Decree. Then, it improperly entered the 2023 Great Lakes Fishing Decree.

By doing so, the District Court impermissibly infringed on the Constitutionally protected treaty rights of a sovereign tribal government. This Court should not permit the District Court to restrict those rights absent Sault Tribe's consent and without applying the correct legal standards and adjudicating

4

the merits. If a party seeking to restrict Sault Tribe's treaty rights cannot prove its legal entitlement to such relief, then Sault Tribe must, as a sovereign government, be presumed able to independently regulate its exercise of its treaty rights, which it has a long history of doing.

## STATEMENT OF THE CASE

Sault Tribe has fished its ancestral waters in the Great Lakes since time immemorial. *United States v. Michigan (Michigan I)*, 471 F. Supp. 192, 221 (W.D. Mich. 1979) (finding at least 12,000 years of tribal fishing in the Upper Great Lakes). In the 1836 Treaty with the Ottawa and Chippewa ("Treaty"), Sault Tribe and the other Plaintiff-Intervenor tribes in this matter ceded a large area of land to the United States. *Id.* at 249, 253. But they reserved their fundamental rights to fish in the Great Lakes. *United States v. Michigan (Michigan II)*, 653 F.2d 277, 278 (6th Cir. 1981).

Historically, Sault Tribe comprehensively self-regulated its Treaty fishing activities. *Michigan I*, 471 F. Supp. at 248, 272 ("Pursuant to [the tribes'] constitutional and ordinance authority, the treaty fishing activities of the Indians in the area ceded by the Treaty of 1836 are comprehensively regulated and enforced.").

- **The State of Michigan unlawfully interfered with Tribal Treaty rights.**

By the 1970s, however, the State of Michigan ("State") was unlawfully arresting and prosecuting tribal members for exercising their Treaty rights. *People v. LeBlanc*, 248 N.W.2d 199, 201 (Mich. 1976); Amended Compl., R. 77, App'x 10-11.[2] In accordance with its "solemn obligation" to protect the Treaty rights from State encroachment, *Michigan II,* 653 F.2d at 278-29, the United States sued the State to restrain it from unlawfully interfering with the tribes' exercise of their Treaty rights. *Michigan I*, 471 F. Supp. at 203.

Plaintiff-Intervenor-Appellee Bay Mills Indian Community ("Bay Mills") intervened in 1974, and Sault Tribe intervened the following year. Order, R. 19, App'x 3-4; Order, R. 47, App'x 6-7. Plaintiff-Intervenors-Appellees Grand Traverse Band of Ottawa and Chippewa Indians ("Grand Traverse"), Little River Band of Ottawa Indians ("Little River"), and Little Traverse Bay Bands of Odawa Indians ("Little Traverse") intervened in 1979, 1998, and 1999, respectively. Order, R. 394;[3] Order, R. 1371; Order, R. 1412. These five tribes may hereinafter be referred to collectively as the "Tribes."

---

[2] Docket numbers 1 through 975 predate the CM/ECF system and are not in the electronic record. The cited documents are included in Sault Tribe's Appendix, ECF No. 29. Page references are to the page numbers of the Appendix generated by the CM/ECF system.

[3] This document appears to be missing from the record and Sault Tribe does not have a copy.

The District Court's initial order held that the Tribes retained their Treaty right to fish "wherever fish are to be found within the area of cession," without limitation "as to the species of fish, origin of fish, the purpose of use or the time or manner of taking." *Michigan I*, 471 F.Supp. at 280-81. On appeal, this Court affirmed the continued existence of the Treaty fishing rights and established a very high standard for any State regulation of Treaty fishing rights. *Michigan II*, 653 F.2d at 278-79. Under that standard, "the state may not restrict Indian treaty fishing" unless it shows "by clear and convincing evidence that it is highly probable that irreparable harm will occur and that the need for regulation exists"— *i.e.*, that there is "an absence of effective Indian tribal self-regulation." *Id.* at 279. In the unlikely event that the State meets that very high standard, any state regulations: "(a) must be a necessary conservation measure, (b) must be the least restrictive alternative method available for preserving fisheries in the Great Lakes from irreparable harm, and (c) must not discriminatorily harm Indian fishing or favor other classes of fishermen." *Id.* The State has never attempted to meet the high standard set by this Court.

After the District Court's 1979 decision, the Tribes continued to self-regulate their Treaty fishing activities, first in accordance with federal standards, then, after those lapsed, under inter-Tribal regulations that the District Court concluded were superior to the lapsed federal standards. *Id.*; *United States v.*

7

*Michigan*, 534 F.Supp. 668, 670 (W.D. Mich. 1982). However, the State continued to interfere with the Tribes' Treaty rights in other ways.

- **The parties entered into a consent decree in 1985 to protect against the State's overfishing and lack of cooperation.**

In 1982, the total harvest of certain fish species in statistical district[4] MH-1 (which covers a large swath of Lake Huron) far exceeded the total allowable catch for that area ordered by the District Court. Memorandum, R. 579, App'x 16; Affidavit of B. Greene, R. 580, App'x 28-31. The Tribes took prompt action to address this threat to the resource by closing the area to Treaty fishers, but the State did not reciprocate despite *State*-licensed fishers having harvested the vast majority of the fish. *Id.* The State's overfishing and lack of cooperation effectively forced the Tribes to self-limit their Treaty rights in order to protect the resource, even as State fishers continued to fish. The Tribes sought and obtained a court order mostly closing the area to State-licensed fishers as well. Order, R. 582, App'x 32-33. A similar situation occurred in 1983. Motion and Memorandum, R. 601, App'x 34, 36-37, 38;[5] Order, R. 603, App'x 60-61.

---

[4] Biologists designate statistical districts in the Great Lakes for purposes of collecting data on fish populations, catch, and effort. Smith *et al*., Fishery Statistical Districts of the Great Lakes (1961), http://www.glfc.org/pubs/TechReports/Tr02.pdf.

[5] This Motion and Memorandum also references a similar situation in 1980. *Id.* at 42.

The Tribes and the State subsequently filed various proposals and plans intended to prevent further instances of overfishing and resultant closures. *See* Tribes' Motion to Allocate Resource, R. 621, App'x 63; State's Counter-Motion for the Court to Adopt a 1984 Fisheries Management Plan, R. 688, App'x 74. In 1984, the District Court appointed a Special Master to, *inter alia*, attempt to mediate a potential resolution by settlement. Order, R. 697, App'x 76. Eventually, all parties[6] agreed to a new management framework for the fishery, and Bay Mills moved the District Court to enter the agreement as a consent order. *United States v. Michigan*, 12 I.L.R. 3079, 3080 (W.D. Mich. 1985).[7] The District Court entered the consent order pursuant to Bay Mills' motion. *Id.* Then Bay Mills—the same party that had moved the District Court to enter the consent order—filed an objection to the consent order and proposed a different plan. *Id.* The District Court set the matter for hearing. *Id.* Crucially, "*[c]ounsel agreed that the court could choose one of the two plans*, or reject both—the latter alternative permitting a *full trial* on the allocation issue." *Id.* (emphasis added).

Ultimately, the District Court chose the parties' original plan and entered it as an order (the "1985 Decree"). *Id.* at 3088-93. The 1985 Decree established a

---

[6] Unless otherwise specified, "parties" refers to the parties to this case—*i.e.*, the Tribes, the State, and the federal government.

[7] Due to the limited availability of this published decision, a copy is included in the Appendix. App'x 83.

framework under which the Tribes and the State would regulate their respective fishing activities for a period of 15 years. *Id.* Thereafter, the 1985 Decree would expire by its terms. *Id.* at 3093.

- **The parties agreed to enter into a new Consent Decree in 2000.**

As expiration of the 1985 Decree approached, the parties did not agree on what should happen next. Various parties proposed various frameworks. None of the proposed frameworks, except the State's, contemplated another broad-reaching consent decree.[8]

The parties did not resolve their conflicting positions before the 1985 Decree expired on May 31, 2000. The matter was set for trial and, in the meantime, the Tribes again self-regulated their Treaty fishing activities under pre-existing inter-Tribal regulations (or, in the case of Little Traverse, under its own regulations). *See* Scheduling Order, R. 1441, Page ID # 3555.

---

[8] Bay Mills, Little River, and Sault Tribe proposed a joint plan under which they would regulate themselves and interact with the State only as necessary to conserve the resource. Request for Relief, R. 1420, Page ID # 3687; Joint Status Report, R. 1416, Page ID # 3729-56 and 3772-93. The United States supported that proposal. Amended Request for Relief, R. 1424, Page ID # 3651-52. Little Traverse proposed its own management plan and asked that the matter be set for trial. Notice Pleading, R. 1419. Grand Traverse advocated a return to Tribal self-regulation. Statement, R. 1422. The State submitted its own proposed consent decree. Notice Pleading, R. 1423, Page ID # 3663, 3671; Joint Status Report, R. 1416, Page ID # 3853-89.

The parties reached an agreement for a new consent decree in August 2000, and the District Court entered the agreed-upon Consent Decree on August 8, 2000 (the "2000 Consent Decree"). Consent Decree, R. 1458. The 2000 Consent Decree stated plainly: "The Decree shall expire on the twentieth (20th) anniversary of its entry." *Id.* at Page ID # 3335. The 2000 Consent Decree further stated: "Upon expiration of this Decree, or if earlier terminated for any reason, the provisions, restrictions, and conditions contained in it shall no longer govern the parties in any manner." *Id.* The 2000 Consent Decree also made clear that it was not intended to create any precedent, stating that "nothing in this Decree shall . . . create a precedent for future allocation or regulation." *Id.*

- **After the other parties excluded Sault Tribe from negotiations for a new consent decree in 2022, the District Court entered the 2023 Decree over Sault Tribe's objections and without a trial or evidentiary hearing.**

As expiration of the 2000 Consent Decree approached, all-party negotiations for a new agreement began in or around September 2019. *See* Brief, R. 1880, Page ID # 10669. Unfortunately, the already-challenging negotiations were further hindered by the COVID-19 pandemic. *Id.* As a result, the District Court granted short-term extensions of the 2000 Consent Decree several times, ultimately until November 14, 2022. Orders, R. 1892, 1903, 1912, 1945, 1963, and 2014. Sault

11

Tribe generally did not oppose these temporary extensions,[9] because the extensions were relatively short and Sault Tribe believed that the additional time would allow it to reach an agreed resolution with the other parties.

Beginning in August 2022—over Sault Tribe's repeated protests—the other six parties excluded Sault Tribe from further negotiations. Motion to Extend Consent Decree, R. 2006, Page ID # 11926; Brief in Support of Motion to Reconsider, R. 2047, Page ID # 12370; Objections to Proposed Consent Decree, R. 2077, Page ID # 12804 n.1; Transcript, R. 2120, Page ID # 14636. On November 14, 2022, the other six parties moved the District Court for an indefinite extension of the 2000 Consent Decree, "until the Court's entry of a successor Decree after its consideration of any party objections to the undersigned parties' proposed successor decree." Motion and Memorandum, R. 2025, Page ID # 12013. The other parties indicated that Sault Tribe opposed the indefinite extension. *Id.* at 12014 n.1; Cert. of Concurrence, R. 2026, Page ID # 12018. Nevertheless, the District Court granted the six parties' motion barely three hours later, extending the 2000 Consent Decree indefinitely without holding a hearing or giving Sault Tribe

---

[9] Sault Tribe opposed the *duration* of the first and last extensions, Memorandum, R. 1887 and Response, R. 2012, but nonetheless sought an extension (albeit of a different duration than that proposed by the other parties) each time. Motions to Extend Consent Decree, R. 1882 and 2006.

the opportunity to respond. Order, R. 2027. Sault Tribe timely filed a motion for reconsideration on December 12, 2022. Motion to Reconsider, R. 2046.

On December 11, 2022 (without notice to Sault Tribe), the other six parties (the "Stipulating Parties") filed their proposed decree. Stipulation for Entry of Proposed Decree, R. 2042. That was also the first time Sault Tribe saw the proposed decree in its final form.

Sault Tribe requested a Federal Rule of Civil Procedure 16 planning conference to "establish a timeline to prepare the matter for trial." Motion, R. 2078, Page ID # 12827. The District Court denied that request, Order, R. 2114, Page ID # 14377, and only permitted Sault Tribe (and any objecting amici) to file "objections" to the proposed decree. Amended Scheduling Order, R. 2053, Page ID # 12396.

Sault Tribe filed objections to the proposed decree (as did amicus curiae Coalition to Protect Michigan Resources). Objections to Proposed Decree, R. 2077 and 2062. The District Court held two days of hearings on the objections. Notice of Hearing, R. 2079; Transcripts, R. 2119 and 2120. It declined to consider expert testimony at the hearing, permitting only attorney oral argument. *See* Order, R. 2106, Page ID # 14334-36. At the conclusion of the hearing, the District Court indicated that it was considering whether to open the record for purposes of expert testimony and stated that it would get an order out regarding that as quickly as it

13

could. Transcript, R. 2120, Page ID # 14818-19. The District Court did not indicate that the parties would need to request such an evidentiary hearing. *See id.* Yet the District Court later issued an order disallowing expert testimony, "especially given that no party requested expansion of the record"—something it had not invited the parties to do. Order, R. 2114, Page ID # 14376. The court further denied Sault Tribe's request for a pretrial conference and case management order, remarking, "Sault Tribe did not accept the Court's invitation to schedule an evidentiary hearing with expert testimony"—though the court never actually extended that "invitation." *Id.* at 14377.

On August 24, 2023, the District Court approved the proposed decree and entered the 2023 Great Lakes Fishing Decree ("2023 Decree") over Sault Tribe's objections. Order, R. 2131, Page ID # 15234. The District Court also dismissed as moot Sault Tribe's motion for reconsideration of the indefinite extension of the 2000 Consent Decree. *Id.* at 15235.

- **The 2023 Decree—to which Sault Tribe objected—significantly restricts the Tribes' exercise of their Treaty rights and does not impose similarly restrictive conditions on the *Defendant* State.**

The 2023 Decree limits the Tribes' Treaty rights in numerous ways, despite the Tribes being *plaintiffs* in this case. For example, the 2023 Decree tells the Tribes (among other things and all in great detail): where they can and cannot fish in their ancestral waters, what type and quantity of fishing gear they can and

14

cannot use, what type and quantity of fish they can harvest, and what times of year they can harvest those fish. 2023 Decree, R. 2132, Page ID # 15244-61,15264-72, 15275. It also requires the Tribes to report extensive and detailed harvest and sales data to the State. *Id.* at 15283-85. The 2023 Decree even imposes significant restrictions, including stringent permitting and harvest reporting requirements, on Tribal subsistence fishing, which is at the core of the Treaty right. *Id.* at 15277-79. All of these restrictions and obligations are imposed not only on the consenting Tribes, but on Sault Tribe as well, despite its lack of agreement and without any adjudication of the other parties' ability to restrict Sault Tribe's Treaty rights without its consent. If this Court allows the 2023 Decree to stand, it will significantly restrict Sault Tribe's exercise of its Treaty rights for at least 24 years, which is the term of the 2023 Decree. *Id.* at 15301. To put that in perspective, it will control Sault Tribe's current fishers, legislators, and executives for the rest of their careers in most cases (if not the rest of their lives).

By contrast, the 2023 Decree imposes comparatively few restrictions on the State. For example, the 2023 Decree permits recreational fishing by State-licensed fishers everywhere in the Treaty waters and only requires the State to provide the Tribes with a very rough estimate of the State's recreational harvest (it does not require the individual recreational fishers to report their harvest). *Id.* at 15261, 15284. Similarly, the 2023 Decree does not impose spawning closures, other

seasonal closures, gear restrictions, or species restrictions for State recreational fishing. *Id.* at 15244-61, 15264, 15266-67, 15275.[10] This disproportionality completely disregards the fact that the State is the *defendant* in this case, that it was the *State* that had to be restrained from interfering with Tribal Treaty rights, and that the *State's* overfishing and inaction led to the 1985 Decree in the first place.

The District Court justified this disproportionality by reasoning that "the magnitude of State commercial fishing is significantly smaller than Tribal commercial fishing." Opinion, R. 2130, Page ID # 15112. But the comparison of State commercial fishing to Tribal commercial fishing is inapt. The State *chose* to prioritize its *recreational* fishery over its commercial fishery, whittling its commercial fishery down to just seven fishers in the Treaty waters. *Id. See also* Defendant Michigan Department of Natural Resources' 2023 Michigan Fishing Guide at 71, https://www.michigan.gov/dnr/-/media/Project/Websites/dnr/Documents /LED/digests/2023_fishing_guide.pdf (describing recreational fishing as "the largest and highest-valued use of the state's fishery resources," and citing the estimated two million recreational fishers

---

[10] State laws and regulations impose certain restrictions on State recreational fishers, but the issue here pertains to what restrictions and requirements the 2023 Decree imposes on the *governments* who are parties to this case. Each government has the legislative and executive discretion to impose whatever permissible restrictions it might wish on its own citizens, but the 2023 Decree improperly imposes more extensive and more stringent restrictions on the Tribal *governments* than on the State.

annually, which generate revenues to the State of over $4 billion annually and provide more than 38,000 jobs). Thus, the majority of the State's fishing activity is recreational, and there are millions of State-licensed recreational fishers, yet its recreational harvest is only roughly estimated. In terms of impact on the resource, however, a dead fish is a dead fish, regardless of whether it was caught by one of the few remaining State-licensed commercial fishers or by one of the millions of recreational fishers the State has chosen to prioritize. Consequently, it is not reasonable for the 2023 Decree to impose very few restrictions on the recreational fishing that comprises the majority of the State's fishing activity while imposing extensive restrictions on the Tribes' fishing activity.

Sault Tribe now timely appeals the District Court's Order entering the 2023 Decree and denying Sault Tribe's motion for reconsideration of the indefinite extension of the 2000 Consent Decree.

## SUMMARY OF ARGUMENT

As applied to Sault Tribe, the 2023 Decree embodies the "perniciousness of consent decrees" that this Court previously recognized in this case. *United States v. Michigan*, 68 F.4th 1021, 1023 n.2 (2023) (internal quotation marks omitted). The other parties excluded Sault Tribe from the last several months of their negotiations, then proposed a Decree that was entered over Sault Tribe's objections. The 2023 Decree improperly deprives the sovereign Sault Tribe of its

Constitutionally protected Treaty rights and strips its officials of their sovereign legislative and executive powers.

The 2023 Decree—entered without Sault Tribe's consent—is *not* a consent decree as to Sault Tribe. It is, instead, a permanent injunction that was entered against Sault Tribe without the Stipulating Parties meeting their burden of showing the necessity of these severe restrictions on Sault Tribe's Treaty rights.

The 2023 Decree should be vacated and this matter remanded on three alternative grounds. First, because the 2023 Decree imposes restrictions and obligations of an injunctive nature on Sault Tribe without its consent, it is not a consent decree. It is, instead, a permanent injunction against Sault Tribe, and the District Court abused its discretion by imposing the 2023 Decree on Sault Tribe without applying the standard for injunctive relief.

Second, if the 2023 Decree constitutes a consent decree binding Sault Tribe (it should not), the District Court abused its discretion by failing to hold a trial to resolve Sault Tribe's objections.

Third, even if no trial were required, the District Court still abused its discretion by entering the 2023 Decree because it: (a) does not further the objectives of the law on which the complaint in this case is based; (b) primarily imposes obligations on the Plaintiff Tribes in this matter absent any violation of the

United States Constitution or federal law on their part; and (c) improperly deprives the parties of their sovereign legislative and executive powers.

Before the District Court abused its discretion in entering the 2023 Decree, it also abused its discretion by indefinitely extending the 2000 Consent Decree without holding the required hearing, making the required findings of fact, applying the stringent standard for modification of a consent decree, or addressing several serious problems with an indefinite extension.

## ARGUMENT

### I. The District Court legally erred by imposing the 2023 Decree on Sault Tribe without its consent and without applying the standard for injunctive relief.

Because the 2023 Decree imposes restrictions and obligations on Sault Tribe without its consent, it is not a consent decree. Instead, it constitutes a permanent injunction as to Sault Tribe and the District Court abused its discretion by failing to apply the standard for injunctive relief.

### A. The 2023 Decree is not a consent decree because it imposes obligations and restrictions on Sault Tribe without its consent.

The 2023 Decree is not a consent decree because it imposes obligations and restrictions on Sault Tribe without its consent. "[A] court may not enter a consent decree that imposes obligations on a party that did not consent to the decree." *Local No. 93, Intern. Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 529 (1986); *see also, e.g.*, *Reynolds v. Roberts*, 251 F.3d 1350, 1357 (11th Cir. 2001)

19

("Lacking the consent of all of the parties, the court obviously lacked the power to enter a decree purportedly based on consent . . . ."); *White v. Alabama*, 74 F.3d 1058, 1073 (11th Cir. 1996) (stating that a district court "consent decree" was not a consent decree because not all of the parties consented to its entry); *People Who Care v. Rockford Bd. of Educ.*, 964 F.2d 639, 640 (7th Cir. 1992) ("We have said many times that judges should not enter consent decrees interfering with the legal entitlements of non-consenting parties."); *United States v. City of Miami*, 664 F.2d 435, 442 (5th Cir. 1981) (per curiam) (concluding that parts of a decree that affect a nonconsenting party cannot properly be included in a valid consent decree); Douglas Laycock, *Consent Decrees Without Consent: The Rights of Nonconsenting Third Parties*, 1987 U. CHI. LEGAL F. 103, 144 (1987) ("A decree that overrides C's rights without the consent of C is not a consent decree.").

As previously discussed, the 2023 Decree imposes extensive restrictions and obligations on Sault Tribe. Yet Sault Tribe never consented—to the contrary, it vigorously objected—to the proposed decree. Objections, R. 2077. Accordingly, the 2023 Decree cannot be a consent decree, at least with respect to Sault Tribe.

Indeed, presumably because the Stipulating Parties had not obtained Sault Tribe's consent to the proposed decree, neither the Stipulating Parties nor the District Court referred to the 2023 Decree as a consent decree. Instead, they simply captioned it a "Decree" of unspecified nature. Stipulation, R. 2042, Page ID #

12161; Order, R. 2131, Page ID # 15234. The District Court acknowledged, "the Proposed Decree is *not* necessarily a 'consent' decree; rather, it is a judicial decree in the ordinary sense of this legal term . . . 'a judicial decision in a court of equity . . . A court's final judgment.'" Opinion, R. 2130, Page ID # 15108 (emphasis added).

### B. The 2023 Decree is a permanent injunction improperly imposed on Sault Tribe.

A consent decree is "a strange hybrid in the law." *Lorain NAACP*, 979 F.2d at 1148 (internal quotations omitted); *see also Firefighters*, 478 U.S. at 519 (referencing the "hybrid nature" of consent decrees). It has "attributes both of contracts and of judicial decrees." *Firefighters*, 478 U.S. at 519 (internal quotations omitted). "[T]he voluntary nature of a consent decree is its most fundamental characteristic," considering that "it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all." *Id*. at 521-23. But a consent decree also has an "injunctive quality." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1018 (6th Cir. 1994). The prospective provisions of a consent decree operate as an injunction. *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983). And a consent decree is a final judicial order. *Id*.

In the ordinary course, a party that does not consent to a "consent" decree is free to continue litigating the case. *Firefighters*, 478 U.S. at 529 ("A court's approval of a consent decree between some of the parties therefore cannot dispose

21

of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor."). Here, however, the District Court simply imposed the 2023 Decree on Sault Tribe over its objections and without any adjudication on the merits. Accordingly, with respect to Sault Tribe, only the injunctive aspects of the 2023 Decree's hybrid nature exist, and it is a final order, so it constitutes a permanent injunction and should be reviewed as such. *See Permanent Injunction*, Black's Law Dictionary (11th ed. 2019) ("An injunction granted after a final hearing on the merits. Despite its name, a permanent injunction does not necessarily last forever.").

The 2023 Decree unquestionably tells the parties (including Sault Tribe) what to do and what not to do—it is injunctive. *See Injunction*, Black's Law Dictionary (11th ed. 2019) ( "A court order commanding or preventing an action."); *Nken v. Holder*, 556 U.S. 418, 428 (2009) (an injunction is "a means by which a court tells someone what to do or not to do"). As discussed above, it imposes significant restrictions and obligations on Sault Tribe, which did not consent to the 2023 Decree. It has a very long term of 24 years, which is essentially permanent for those Sault Tribe fishers, legislators, and executives who will be subject to the 2023 Decree for the rest of their careers (if not lives). And it purports to be the Court's final decision on the matter (as opposed to an interim decision) after a final hearing (though not an evidentiary one). Accordingly, the

Decree constitutes a permanent injunction, at least with respect to Sault Tribe. *See Capital City Gas Co. v. Phillips Petro. Co.*, 373 F.2d 128, 131 (2d Cir. 1967) (finding that a "Judgment Order" was a permanent injunction because "it grants [movant] all the relief it might ultimately be entitled to and makes no provision for further hearings.").

### C. The 15 considerations applied by the District Court are inapplicable.

The District Court evaluated the proposed 2023 Decree using the 15 considerations identified by former District Court Judge Enslen in approving the 1985 Decree. Opinion, R. 2130, Page ID # 15106. In doing so, the District Court here applied the wrong standard, and failed to recognize that the circumstances in which Judge Enslen applied the 15 factors were significantly and materially different than the circumstances at issue here.

As discussed above, in 1985, when Bay Mills objected to the proposed consent order after all parties (including Bay Mills) had agreed to it, and proposed a different plan, "*[c]ounsel agreed that the court could choose one of the two plans*, or reject both—the latter alternative permitting a *full trial* on the allocation issue." *United States v. Michigan*, 12 I.L.R. 3079, 3080 (W.D. Mich. 1985) (emphasis added).

Accordingly, when the proper context is provided, the 15 considerations that Judge Enslen believed were appropriate in making a "fair and equitable decision"

are better understood as factors going towards the fairness, adequacy, and reasonableness of a proposed *consent* decree. *Vukovich*, 720 F.2d at 921 ("The ultimate issue the court must decide at the conclusion of the [consent decree reasonableness] hearing is whether the decree is fair, adequate and reasonable."). Indeed, by stating that there would be a full trial if he did not choose one of the two plans *that all parties had agreed he could choose from*, Judge Enslen appears to have acknowledged that he did *not* have the authority to foist a plan on a non-consenting party without a full trial on the merits.

But that is what the District Court has done here. Unlike Bay Mills in 1985, Sault Tribe never agreed to the proposed decree at any point, did not move the District Court for entry of the decree, and never consented to be bound by the 2023 Decree. Accordingly, the District Court erred in applying Judge Enslen's 15 considerations.

### D. The District Court abused its discretion by improperly enjoining Sault Tribe without requiring the moving parties to satisfy the standard for injunctive relief.

"A party potentially prejudiced by a decree has a right to a judicial determination of the merits of his objection." *City of Miami*, 664 F.2d at 447. To the extent a decree affects nonconsenting parties, "its validity must be tested by the same standards that are applicable in any other adversary proceeding." *Id*. at 436. As discussed above, because the 2023 Decree is a permanent injunction, at least as

to Sault Tribe, the Stipulating Parties had to meet the permanent injunction standard. Because they did not—indeed, the District Court did not even evaluate whether the 2023 Decree might meet that standard—it must be reversed.

The standard of review on appeal for the District Court's ultimate conclusion of whether to grant a permanent injunction is abuse of discretion. *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015) ("We review the district court's grant of a permanent injunction for abuse of discretion."). However, the District Court's underlying legal conclusions are reviewed de novo. *Sec'y of Lab. v. 3Re.com, Inc.*, 317 F.3d 534, 537 (6th Cir. 2003).[11] And a district court abuses its discretion when it improperly applies the law. *Howe*, 801 F.3d at 753. A district court also abuses its discretion when its decision is "clearly unreasonable, arbitrary, or fanciful." *McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 488, 491 (6th Cir. 2014) (internal quotations omitted).

The party seeking a permanent injunction bears the burden of justifying such relief, *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006), by clear and convincing evidence. *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 n.3 (6th Cir. 2007); *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir.

---

[11] The District Court's factual findings are reviewed under a clearly erroneous standard. *Id*.

2002) (unpublished); *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331, 1998 WL 152951 at \*3 (6th Cir. 1998) (unpublished).

Permanent injunctive relief is a "drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Rather, it should be granted only sparingly and only for compelling reasons. *Ghandi v. Police Dept. of City of Detroit*, 747 F.2d 338, 343 (6th Cir. 1984). The district court should limit the scope of a permanent injunction to conduct "which has been found to have been pursued or is related to proven unlawful conduct." *Howe*, 801 F.3d at 753 (internal quotations omitted).

To obtain a permanent injunction, the movant must establish: (1) that the movant has suffered irreparable harm; (2) that there is no adequate remedy at law; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that it is in the public's interest to issue the injunction. *Audi AG*, 469 F.3d at 550 (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

The standard for injunctive relief is particularly high when the party to be enjoined is a governmental agency: "[J]udicial intervention to prevent potential injury from prospective government misconduct is only justified when such misconduct is imminent, not merely hypothetical." *Ghandi*, 747 F.2d at 343-44 (citing *Halkin v. Helms*, 690 F.2d 977, 1005 (D.C. Cir. 1982)). Isolated instances

26

of official misconduct are not enough; the proponent must establish that there has been a persistent pattern of official misconduct as well as a substantial risk that future violations will occur. *Id.* at 344 (citing *Allee v. Medrano*, 416 U.S. 802, 815 (1974)).

Here, the Stipulating Parties did not even attempt to meet the standard for injunctive relief, and the District Court did not apply that standard. The Stipulating Parties merely filed a "Stipulation for Entry of Proposed Decree Subject to the Court's Consideration of Objections." R. 2042 ("Stipulation"). The Stipulation does not address whatsoever any of the factors necessary for injunctive relief. *See id*.

Nor did the District Court's Opinion apply the standard for injunctive relief or address any of its factors. *See* Opinion, R. 2130. This failure—while granting relief that constitutes a permanent injunction against Sault Tribe—was error. *See Reynolds*, 251 F.3d at1358 (finding it "procedurally improper" for a district court to enter an injunction *sua sponte* after parties were unable to reach agreement for a consent order). The Court should reverse and remand this action to the District Court for further proceedings consistent with the requirements of a request for permanent injunctive relief.

## II.    Even if the 2023 Decree were construed as a consent decree, the District Court abused its discretion in entering the 2023 Decree.

Even if, for argument's sake, the 2023 Decree were construed as a consent decree, the District Court abused its discretion in entering the 2023 Decree in several ways. First, by failing to hold a trial to resolve Sault Tribe's objections to the 2023 Decree. Second, because the 2023 Decree does not further the objectives of the law upon which the complaint in this case was based. Third, because the 2023 Decree primarily imposes obligations on the Tribes (who are Plaintiffs in this matter) absent any violation of the United States Constitution or federal law by the Tribes. And fourth, because the 2023 Decree improperly deprives the parties of their sovereign legislative and executive powers.

This Court reviews a District Court's entry of a consent decree under the same appellate review standard as set forth for a permanent injunction, *see supra* Part I.D (*i.e.*, de novo review for underlying legal conclusions, abuse of discretion for the ultimate decision). *Vanguards of Cleveland*, 753 F.2d at 484.

Under normal circumstances, *when all parties have agreed* to a proposed consent decree, a court should hold a reasonableness hearing to determine "whether the decree is fair, adequate, and reasonable." *Vukovich*, 720 F.2d at 921. The court must also evaluate the adequacy of the decree "by weighing the movant's likelihood of success on the merits against the amount and form of relief offered" by consent. *Id*. at 922 (internal quotations omitted). The court must not

approve a consent decree that is "illegal, a product of collusion or contrary to the public interest." *Id.* at 920.

However, as explained in Part II.A, below, where, as here, a proposed consent decree will affect the rights of an objecting party, a reasonableness hearing and determination is not sufficient. Instead, a trial on the merits is required.

Even if that were not the case (which it is), the 2023 Decree does not meet the above standard for a consent decree. It is neither fair nor reasonable, and it is contrary to applicable law, the product of collusion, and contrary to the public interest. It should be reversed.

### A. The District Court abused its discretion by entering the 2023 Decree, which improperly limits Sault Tribe's exercise of its treaty rights, over Sault Tribe's objection and without holding a trial.

It is axiomatic that a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree. *Firefighters*, 478 U.S. at 529. It is "clear that a consent decree requires the consent of all parties whose legal rights would be adversely affected by the decree." *United States v. City of Hialeah*, 140 F.3d 968, 975 (11th Cir. 1998); *see also, e.g.*, *City of Miami*, 664 F.2d at 442 (concluding that parts of a decree that affect a nonconsenting party cannot properly be included in a valid consent decree); *White v. Alabama,* 74 F.3d 1058, 1073 (11th Cir. 1996) ("[A] decree that provides a remedy agreed to by some, but not all, of the parties cannot affect the rights of a dissenting party).

29

As this Court recently noted in this very case, consent decrees perniciously "provide[] the legitimacy of a judicial decision without the reality of a judicial decision." *United States v. Michigan*, 68 F.4th 1021, 1023 n.2 (6th Circuit 2023) (quoting Douglas Laycock, *Consent Decrees Without Consent: The Rights of Nonconsenting Third Parties*, 1987 U. Chi. Legal F. 103, 132 (1987)). That poses a significant problem when a party whose rights will be affected by a consent decree does not consent, because "it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all." *Firefighters*, 478 U.S. at 522. To paraphrase the *City of Hialeah* Court, if a court could dispense with the consent of one party, why should any party's consent be required? 140 F.3d at 981. Beyond that, if a court can enter a consent decree without consent, why should adjudication of the merits in any case be required? Of course, that is not a reasonable result.

"A party potentially prejudiced by a decree has a right to a judicial determination of the merits of his objection." *City of Miami*, 664 F.2d at 447. To the extent a decree affects nonconsenting parties, "its validity must be tested by the same standards that are applicable in any other adversary proceeding." *Id.* at 436. "[T]hat can be done only in a judgment entered following trial (or summary judgment)." *City of Hialeah*, 140 F.3d at 977; *see also United States v. Ward Baking Co.*, 376 U.S. 327, 334 (1964) (remanding for trial a "consent" judgment

30

entered without the actual consent of the plaintiff government); *City of Miami*, 664
F.2d at 436 (remanding for trial a consent decree that affected the rights of an
objecting party).

Here, similar to *City of Hialeah*, 140 F.3d at 983-84, six parties to this case
crafted a settlement agreement without the consent of the seventh party and refused
to allow the seventh party to participate in the last several months of negotiations.
But the result here is even more egregious than in *City of Hialeah*. In that case, the
non-consenting party's contractual rights would be affected. In this case, Sault
Tribe's *Treaty rights*—rights of paramount importance, protected under the United
States Constitution as the supreme law of the land—are restricted by the 2023
Decree, without the sovereign's consent. The *City of Hialeah* court characterized
its similar scenario as an "elephant" in the room and stated that it would not close
its eyes to the elephant's existence, concluding: "We will not hold that a party's
legally enforceable contract rights can be discarded without affording that party the
right to litigate the case on the merits." *Id.*

As discussed above, the previous District Court judge in this case repeatedly
recognized the need to hold a trial on the merits when one or more parties have
proposed decrees without the unanimous consent of all parties. For example, in
1985, Judge Enslen indicated that he would hold a full trial on the merits if he did
not approve one of two plans that all parties had agreed he could choose from.

31

*United States v. Michigan*, 12 I.L.R. 3079, 3080 (W.D. Mich. 1985). And in 1999, when multiple parties submitted multiple proposals regarding what should happen upon expiration of the 1985 Decree, Judge Enslen set the matter for trial. Scheduling Order, R. 1441. Similarly, when the State attempted to unilaterally impose "emergency regulations" in 1981, this Court instructed the District Court to hear evidence and adjudicate the permissibility of the proposed regulations. *Michigan II*, 653 F.2d 277, 279 (6th Cir. 1981). Thus, as demonstrated by the law and the precedent in this case, the proper procedure absent Sault Tribe's consent to the proposed decree was to schedule the matter for trial.

Given the importance of the sovereign rights at stake here, the extensive limitations on those rights in the proposed decree, the lack of comparable restrictions on the *Defendant* State, Sault Tribe's vigorous objections, and the other parties' collusion in excluding Sault Tribe from negotiations, the District Court should not have proceeded as it did. Accordingly, even if this Court construes the 2023 Decree as a consent decree (which it should not), it should hold that the District Court abused its discretion by entering the 2023 Decree over Sault Tribe's objection and without holding a trial on the merits, and remand.

**B. The District Court abused its discretion by entering the 2023 Decree because it does not further the objectives of the law on which the complaint is based.**

"Consent decrees entered in federal court must be directed to protecting federal interests." *Frew v. Hawkins*, 540 U.S. 431, 437 (2004). A federal consent decree must "further the objectives of the law upon which the complaint was based." *Id.* (citing *Firefighters*, 478 U.S. at 525). Furthermore, as discussed in *City of Miami*:

> In assessing the propriety of giving judicial imprimatur to the consent decree, the court must also consider the nature of the litigation and the purposes to be served by the decree. If the suit seeks to enforce a statute, the decree must be consistent with the public objectives sought to be attained by Congress.

664 F.2d at 441; *cf. Vanguards of Cleveland*, 753 F.2d at 484 (in determining whether a consent decree is fair, adequate, and reasonable, "the court must consider, *inter alia*, whether the affirmative action plan is reasonably related to the objective of remedying prior discrimination").

The 2023 Decree does not further the objectives of the 1836 Treaty, which is the law on which the complaint was based. The United States brought this action to confirm the Tribes' rights under the Treaty and to enjoin *the State* from interfering with those rights. Amended Compl., R. 77, 4-6. Rather than *further* the Tribes' exercise of the Treaty rights confirmed in this case, the 2023 Decree significantly *restricts* them. For example, as discussed above, the 2023 Decree unreasonably

restricts the Tribes from fishing in various areas, at various times of year, for various species, and using various fishing gear. It also restricts the quantity of fish the Tribes can harvest, imposes extensive information sharing requirements on the Tribes, and restricts Tribal subsistence fishing. In contrast, the 2023 Decree imposes relatively minimal restrictions on the State—the Defendant this suit was brought to enjoin.

The Tribes are Plaintiffs in this action and it does not further the objectives of the Treaty to impose such extensive restrictions and obligations on the Tribes. This oversight is particularly egregious given the comparatively few restrictions the 2023 Decree places on the State. The 2023 Decree does not meet the *Vukovich* standard for consent decrees, and the District Court abused its discretion by entering it. *See* 720 F.2d at 920-24.

### C. The District Court abused its discretion by entering the 2023 Decree because it primarily imposes obligations on the Plaintiff Tribes absent any violation of the United States Constitution or federal law by the Tribes.

The District Court abused its discretion by entering the 2023 Decree because it primarily imposes obligations on *the Tribes*—Plaintiffs in this action—without any allegation or proof that they have violated the United States Constitution or federal law. "Federal courts may not order . . . governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 389

34

(1992). Likewise, "federal court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation." *Horne v. Flores*, 557 U.S. 433, 450 (2009) (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)). "Consent decrees are not entitlements. Instead, a decree may remain in force only as long as it continues to remedy a violation of federal law." *John B. v. Emkes*, 710 F.3d 394, 398 (6th Cir. 2013); *see also United States v. Junction City Sch. Dist.*, 14 F.4th 658, 667-68 (8th Cir. 2021) ("Without the prerequisite showing that the current condition flows from a violation of federal law, [expanding the scope of a consent decree] is not a job of a federal judge."); *Jackson v. Los Lunas Cmty. Prog.*, 880 F.3d 1176, 1207 (10th Cir. 2018) ("[C]ontinued enforcement of the consent decrees is warranted only to the extent Defendants are in current violation of federal law or have reached only fleeting compliance"); *Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*, 669 F.3d 737, 742 (6th Cir. 2012) ("And thus the core issue to be resolved in this litigation is whether, 31 years out, the decree's racial classifications continue to remedy past discrimination by the Fire Department."); *Lorain NAACP*, 979 F.2d at 1153 (holding that a district court abused its discretion by increasing a state's financial obligations under a consent decree in the absence of any adjudicated or admitted violation of law or constitutional violation); *Vanguards of Cleveland*, 753 F.2d at 484 ("A consent

35

decree may not embody an affirmative action plan unless the employer has utilized

minorities at a rate less than their proportion in the relevant labor market," and

"must terminate when the underutilization of minorities has been corrected.").

Moreover, to the extent the 2023 Decree constitutes an injunction, it is

improper because it restrains the Tribes' permissible conduct. "[A]n injunction is

overly broad when . . . it restrains legal conduct . . . or is not closely related to the

conduct found to justify injunctive relief." *Union Home Mortg. Corp. v. Cromer*,

31 F.4th 356, 364 (6th Cir. 2022); *see also NAACP v. Claiborne Hardware Co.*,

458 U.S. 886, 924 n.67 (1982) (directing that an injunction must be dissolved or

"modified to restrain only unlawful conduct and the persons responsible for

conduct of that character"); *Clark v. Coye*, 60 F.3d 600, 605 (9th Cir. 1995)

(holding that a district court's issuance of an injunction prohibiting certain conduct

without first making a judicial determination that the conduct violated federal

constitutional or statutory law "clearly constituted an abuse of discretion");

WRIGHT & MILLER, FED. PRAC. & PROC. § 2995 (3d ed.) ("[A] court must be

cautious in framing a broad injunction lest it prohibit the exercise of

constitutionally protected rights.").

As discussed above, the 2023 Decree primarily imposes restrictions and

obligations on the Tribes, with comparatively few restrictions and obligations on

the State. But the Tribes are *Plaintiffs*, not Defendants, in this matter. They are not

engaged in any violation of the United States Constitution or federal law, nor does the 2023 Decree prohibit any such conduct. To the contrary, the 2023 Decree restrains them from various types of *lawful* conduct in the exercise of their Treaty rights—rights that were affirmed by this Court. The only *unlawful* conduct at issue in this case is the State's interference with the Tribes' Treaty rights, which this case was commenced to restrain. *Michigan I*, 471 F.Supp. 192, 203 (W.D. Mich. 1979).

Accordingly, the District Court abused its discretion by entering the 2023 Decree because it primarily imposes restrictions and obligations on the Tribes, who are not the parties alleged or determined to have violated the United States Constitution or federal law. This is equally true to the extent the 2023 Decree constitutes an injunction and restrains lawful conduct by the Tribes.

### D. The District Court abused its discretion by entering the 2023 Decree because it improperly deprives the parties of their sovereign legislative and executive powers.

A federal district court should not enter a consent decree that will improperly deprive future government officials of their designated legislative and executive powers. *Frew*, 540 U.S. at 441 (if not appropriately limited, consent decrees involving governments "may improperly deprive future officials of their designated legislative and executive powers"); *Milliken*, 433 U.S. at 280-81 ("[F]ederal courts . . . must take into account the interests of [governmental]

authorities in managing their own affairs . . . ."); *Evans v. City of Chicago*, 10 F.3d 474, 482 (7th Cir. 1993) (en banc) ("Unless there is a substantial claim under federal law, the district judge should not enter or continue to enforce a consent decree affecting the operation of a governmental body."). When officials inherit overbroad or outdated consent decrees that limit their ability to respond to the priorities and concerns of their constituents, "they are constrained in their ability to fulfill their duties as democratically-elected officials." *Horne*, 557 U.S. at 449. A court should not substitute its own policy judgments for those of the government officials to whom such decisions are properly entrusted. *See id.* at 455. As this Court has recognized, binding all future officers of a government to a decree's proscriptions "would be a perverse and undemocratic state of affairs." *Doe v. Briley*, 562 F.3d 777, 781 (6th Cir. 2009) (internal quotations omitted).

As public servants, government officials must be presumed to have a high degree of competence in deciding how best to manage their governmental responsibilities. *Frew*, 540 U.S. at 442. Accordingly, a federal court "must exercise its equitable powers to ensure that when the objects of the decree have been obtained, responsibility for discharging [a government's] obligations is returned promptly to the [government] and its officials." *Id.*; *see also John B.*, 710 F.3d at 413 (responsibility for discharging a government's obligations must be returned promptly to the government and its officials once circumstances warrant).

38

The 2023 Decree improperly deprives all seven governments of their legislative and executive powers with respect to their regulation of fishing activities for the next 24 years. That impropriety is heightened in the case of Sault Tribe, which never consented to the 2023 Decree (so not only its future officials, but also its current officials, are improperly deprived of their legislative and executive powers). Sault Tribe is a sovereign government with a strong and legitimate governmental interest in managing its own Treaty fishing activities. It has the authority to enact laws and promulgate regulations governing its territory and members (including the off-reservation treaty fishing activities of its members). *E.g.*, *United States v. Wheeler*, 435 U.S. 313, 323 (1978); *Settler v. Lameer*, 507 F.2d 231, 237-38 (9th Cir. 1974). The law presumes that tribes can self-regulate their treaty hunting and fishing activities. *See, e.g.*, *Michigan II*, 653 F.2d 277, 279 (6th Cir. 1981) (establishing that the State may regulate only in circumstances including "the absence of effective Indian tribal self-regulation"); *Mille Lacs Band of Chippewa Indians v. Minnesota*, 952 F. Supp. 1362, 1384 (D. Minn. 1997) (the state is "barred from regulating the Indian treaty rights if the Bands can effectively self-regulate and the tribal regulations are adequate to meet conservation needs"), *aff'd*, 124 F.3d 904 (8th Cir. 1997), *aff'd*, 526 U.S. 172 (1999); *Lac Courte Oreilles Band v. Wisconsin*, 668 F. Supp. 1233, 1241 (W.D. Wis. 1987) (tribes may self-regulate exclusive of state regulation so long as tribal

39

self-regulation is effective). Thus, Sault Tribe is presumptively entitled to self-regulate.[12]

Indeed, the Tribes have a history of self-regulation. As discussed above, the Tribes self-regulated their fishing activities: (1) from time immemorial to the District Court's 1979 decision; (2) between the District Court's 1979 decision and its entry of the 1985 Decree; and (3) between the expiration of the 1985 Decree and the District Court's entry of the 2000 Consent Decree. In short, there is ample precedent for tribal self-regulation and it is appropriate.

It is time to return to Sault Tribe the responsibility of making its own legal and policy decisions and regulating its own Treaty fishing activities.[13] Otherwise, Sault Tribe is improperly deprived of the ability to exercise its legislative and executive powers as a sovereign government, which is contrary to federal policies supporting tribal sovereignty and self-government. *E.g.*, *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216-17 (1987) ("[T]raditional notions of Indian sovereignty and the congressional goal of Indian self-government . . . are

---

[12] Tribes elsewhere self-regulate their treaty rights activities. For example, in *Mille Lacs*, the court approved a stipulation between the parties for tribal self-regulation of treaty fishing activities. 952 F. Supp. at 1397. And in *United States v. Washington*, the court found tribes qualified to self-regulate the off-reservation fishing of their members. 384 F. Supp. 312, 333 (W.D. Wash. 1974).

[13] If there is any legitimate need for the Tribes, State, and the federal government to coordinate any specific aspects of their respective fisheries management, Sault Tribe would welcome the other parties back to the table to negotiate a much more limited and appropriate agreement on those specific topics.

important federal interests."); *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987) ("We have repeatedly recognized the Federal Government's longstanding policy of encouraging tribal self-government.").

## III. The District Court abused its discretion by indefinitely extending the 2000 Consent Decree.

If this Court agrees that the District Court abused its discretion in entering the 2023 Decree, then it should also conclude that the Court abused its discretion when it indefinitely extended the 2000 Consent Decree. Order, R. 2027. Sault Tribe objected to the indefinite extension of the 2000 Consent Decree and moved for the District Court's reconsideration of that order. Motion, R. 2046.[14] The District Court did not rule on that motion until it entered the 2023 Decree, at which point it dismissed the motion as moot. Order, R. 2131, Page ID # 15235. But if this Court vacates the 2023 Decree, then Sault Tribe's motion for reconsideration of the District Court's order indefinitely extending the 2000 Consent Decree, R. 2046, is not moot. *See James v. City of Detroit*, Nos. 20-1805/21-1053, 2021 WL 5463778, at *3-4 (6th Cir. Nov. 23, 2021) (holding motion for reconsideration of order striking amended allegations no longer moot when amended allegations reinstated). Nonetheless, in the interest of judicial efficiency, this issue should not

---

[14] This Motion for Reconsideration was the first opportunity Sault Tribe had to oppose the indefinite extension because the District Court issued the order indefinitely extending the 2000 Consent Decree without affording Sault Tribe the opportunity to respond. Motion, R. 2047, Page ID # 12370-71.

be remanded to the District Court—instead, this Court should conclude that the District Court abused its discretion by indefinitely extending the 2000 Consent Decree.

This Court reviews a modification of a consent decree under the same appellate review standard set forth in Part I.D, above (de novo review for underlying legal conclusions, abuse of discretion for the ultimate decision). *Lorain NAACP*, 979 F.2d at 1147-48.

The extension of a consent decree without the consent of all parties is a signal event that requires an evidentiary hearing and specific findings of fact supporting the extension. The District Court abused its discretion by disregarding this well-established procedural requirement and the applicable legal standard.

There was no legal or factual basis to warrant an indefinite extension of the 2000 Consent Decree with respect to Sault Tribe without its consent for four reasons. First, the District Court did not hold the evidentiary hearing or make the findings of fact that were required to modify the Decree. Second, neither the movants nor the District Court attempted to meet the relevant standard for modification of the 2000 Consent Decree. Third, an indefinite extension of the 2000 Consent Decree is contrary to the clear and unambiguous expiration provision of the 2000 Consent Decree and wreaks havoc on the parties' bargain. Fourth, extension of a consent decree in the absence of a party's non-compliance

42

with the consent decree is unprecedented. And fifth, indefinitely binding Sault Tribe—a sovereign government—to the 2000 Consent Decree is no longer equitable.

### A. The District Court did not hold the required evidentiary hearing or make the required factual findings.

A court must not extend a consent decree without holding an evidentiary hearing and supporting the extension with specific findings of fact. *E.g.*, *Holland v. N.J. Dep't of Corr.*, 246 F.3d 267, 284 (3rd Cir. 2001) ("Even if a court has the power to modify or enforce compliance with a consent decree, it must support its issuance of such an order with specific findings of fact."); *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) ("[M]odification of a consent decree requires 'a complete hearing and findings of fact.'") (quoting *Akers v. Ohio Dep't of Liquor Control*, 902 F.2d 477, 479 (6th Cir. 1990)); *Heath v. DeCourcy*, 992 F.2d 630, 635 (6th Cir. 1993) (vacating and remanding the district court's modification of a consent decree because it failed to conduct a complete hearing by not allowing any evidence or expert testimony to be presented). Modification of a consent decree without the consent of all parties is a "signal event that requires a material change in circumstances that only a formal hearing and appropriate findings of fact can demonstrate." *United States v. Wayne Cty.*, 95 F. App'x 809, 812 (6th Cir. 2004) (unpublished).

An indefinite extension of the 2000 Consent Decree purportedly binding Sault Tribe, a sovereign government, without its consent, and restricting its exercise of its Treaty rights, is indeed a signal event. Yet Sault Tribe was not provided an opportunity to respond to the Motion to Extend. The District Court did not hold an evidentiary hearing (or any hearing), and it made no required findings of fact. Making such a significant modification of the 2000 Consent Decree— indefinitely extending its term without a sovereign government's consent—without following those required steps is wholly improper.

### B. Neither the movants nor the District Court applied the standard necessary to extend the 2000 Consent Decree.

Modification of a consent decree over a party's objection is an extraordinary remedy and is subject to a high standard, which the movants did not meet. First, they must show that a significant change in circumstances warrants revision of the 2000 Consent Decree. *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992). For example, (1) changed factual conditions make compliance with the decree substantially more onerous; (2) the decree proves to be unworkable because of unforeseen circumstances; or (3) enforcement of the decree without modification would be detrimental to the public interest. *Id.* at 384.

If, and only if, the movants meet that standard, then the District Court must next determine whether the proposed modification is suitably tailored to the changed circumstances. *Id.* at 383. Modifications should generally only be granted

44

for genuinely unanticipated changes in circumstances. *Id.* at 385. A court should not rewrite the consent decree merely for the convenience of a party. *Id.* at 391; *East Brooks Books, Inc. v. City of Memphis*, 633 F.3d 459, 465 (6th Cir. 2011). Modification of a consent decree is an "'extraordinary remedy that should not be undertaken lightly.'" *East Brooks Books*, 633 F.3d at 465 (quoting *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1147 (6th Cir. 1997) (Jones, J., concurring)). This is especially true "where the design is not to relieve a party of obligations but to impose new responsibilities." *Juan F. v. Weicker*, 37 F.3d 874, 878 (2d Cir. 1994) (quoting *Walker v. HUD*, 912 F.2d 819, 826 (5th Cir. 1990)). "A contrary rule would discourage compromise for fear of adverse judicial modification." *Id.* (internal quotations omitted).

Here, the Motion to Extend did not allege any changed factual conditions or unforeseen circumstances to warrant extension of the 2000 Consent Decree (nor do any exist). The Motion fails on that basis alone.

Having alleged no change in circumstances whatsoever, naturally the movants did not discuss whether the extension is suitably tailored to any such changed circumstances. The Motion fails on that basis as well. The movants did not even attempt to meet the relevant standard, so their Motion should have been denied in the first instance.

Moreover, the District Court's Order did not make the required findings of fact, nor did it discuss how the Motion to Extend met the *Rufo* standard (it did not). Accordingly, this Court should find that the District Court abused its discretion in indefinitely extending the 2000 Consent Decree.

### C. An indefinite extension of the 2000 Consent Decree wreaks havoc on the parties' bargain, contrary to established law.

An indefinite extension of the 2000 Consent Decree is also contrary to the express terms of the 2000 Consent Decree. As the movants noted in their Motion, R. 2025, Page ID # 12015, the District Court previously stated that "[i]f the Decree ends without a successor agreement, the basic agreement between the parties is more than upset; it is nonexistent." July 2020 Opinion, R. 1892, Page ID # 10822. But the parties did not agree to be forever subject to a consent decree framework. Their specific bargain was, in fact, *not* to be bound by the terms of the 2000 Consent Decree after 20 years had passed. R. 1458, Page ID # 3335 ("The Decree shall expire on the twentieth (20th) anniversary of its entry. . . . . Upon expiration of this Decree, or if earlier terminated for any reason, the provisions, restrictions, and conditions contained in it shall no longer govern the parties in any manner."). The agreed-upon expiration provision of the 2000 Consent Decree is clear and unambiguous. While Sault Tribe previously agreed to short-term extensions of the 2000 Consent Decree while attempting to negotiate a new agreement during the

pandemic, an indefinite extension of the 2000 Consent Decree dramatically

changes the bargain struck in the 2000 Consent Decree, in violation of clear law.

In *Northeast Ohio Coalition for the Homeless v. Husted*, the plaintiffs

sought to extend the definite expiration date of a consent decree pertaining to

voting rights.  No. 2:06-CV-896, 2017 WL 1531811, at *2 (S.D. Ohio Apr. 28,

2017). The defendants opposed the motion. *Id.* The court agreed with the

defendants that the extension would "*fundamentally alter* the parties' bargain"—

the defendants "had entered into the Consent Decree with the understanding that

they *would not be bound permanently*." *Id.* at *10-11 (emphasis added). While a

previous extension of approximately three and a half years had been appropriate

because the decree had failed to achieve its intended purposes, and the extension

through one additional election cycle was suitably tailored to address those

failures, the court found there was no evidence of subsequent failures. *Id.* at *11.

Consequently, the court held that it was obligated to "recognize the bargain struck

by the parties." *Id.* "Extending a Consent Decree from three, to seven, to fifteen

years *wreaks havoc* on that bargain . . . ." *Id.* (emphasis added). Accordingly, the

court found that the extension was not warranted by significant changed

circumstances and declined to extend it any longer. *Id.* at *11-12.

Similarly, in *E.E.O.C. v. Local 40 Int'l Ass'n of Bridge, Structural &*

*Ornamental Iron Workers*, the Second Circuit considered whether a district court

had jurisdiction over a motion to enforce a consent decree which provided by its terms that it "shall expire three (3) years from the date of entry hereof." 76 F.3d 76, 78-79 (2d Cir. 1996). The consent decree had already expired. *Id.* The Second Circuit found that the expiration provision was unambiguous, *id.* at 80, and reversed the district court's order asserting jurisdiction pursuant to the expired consent decree, explaining:

> If we were to enforce this consent decree against Local 40 twelve years after its expiration, *we would be depriving the union of the benefit of its bargain*. The decree resulted from a negotiated settlement between Local 40 and plaintiffs. As part of the settlement, Local 40 agreed to institute numerous specific operational changes . . . . *In exchange for these concessions, the union received a concession from the plaintiffs— that the order would only be enforceable against Local 40 for three years*, unless the EEOC were able to convince the district court that a modification was necessary.

*Id.* at 81 (emphasis added).

As in those cases, the parties in this case agreed that they would only be subject to the 2000 Consent Decree for a term of 20 years, and no more. Given the significant restrictions that the 2000 Consent Decree imposed on Sault Tribe's Treaty rights, the expiration provision was a material component of that bargain— Sault Tribe did not agree to those restrictions permanently or indefinitely. An indefinite extension of the 2000 Consent Decree improperly betrays that bargain.

### D. An indefinite extension of a consent decree without the consent of all parties and absent a lack of compliance with the consent decree is unprecedented.

The indefinite extension of the 2000 Consent Decree without the consent of all parties was unprecedented. After a thorough search, Sault Tribe has not located any cases in which a federal court extended a consent decree without the consent of all parties burdened by the decree, except where there had been a proven (and often egregious) lack of compliance. In addition, when courts grant an extension, they typically tailor the extension narrowly to redress the demonstrated lack of compliance. Thus, they sometimes extend a consent decree for a short time period commensurate with the duration of the lack of compliance, or until certain conditions are achieved that would fulfill the parties' agreement, such as allowing monitoring for a certain number of hiring cycles or election cycles. *E.g.*, *Vanguards of Cleveland*, 23 F.3d. at 1016, 1020 (affirming the two-year extension of a consent decree intended to redress employment discrimination to compensate for two years when hiring exam pass rates were lower than expected); *Thompson v. United States Department of Housing & Urban Development*, 404 F.3d 821, 831-32, 834 (4th Cir. 2005) (affirming the extension of a consent decree in light of the defendants' "*near total failure* to comply," until such time as the obligations imposed by the consent decree were fulfilled) (emphasis added); *David C. v. Leavitt*, 242 F.3d 1206, 1208, 1211-12 (10th Cir. 2001) (upholding the extension of

a consent decree until the defendant—who was *80% out of compliance*—had fulfilled its obligations under the consent decree).

Numerous other examples exist. But this case is fundamentally different from any of these examples. Sault Tribe was never in violation of any law. Rather, it was the State of Michigan that had to be restrained from interfering with Sault Tribe's Treaty rights. *Michigan I*, 471 F. Supp. at 203. The 2000 Consent Decree imposed no specific, measurable goals that had to be achieved by the expiration date. And the movants did not suggest that Sault Tribe was out of compliance with the terms of the 2000 Consent Decree as a general matter, or in a fashion that the indefinite extension would remedy. Consequently, there was no reason to indefinitely extend the 2000 Consent Decree for lack of compliance, and it is unprecedented to extend it indefinitely (or even for a definite period of significant duration) *without* lack of compliance.

### E.  A consent decree binding Sault Tribe is no longer equitable.

"The Constitution trumps a consent decree." *Cleveland Firefighters*, 669 F.3d. at 742. And the Constitution provides that treaties are "the supreme Law of the Land." U.S. CONST. art. VI, § 2. The 2000 Consent Decree imposed significant restrictions on Sault Tribe's Treaty rights for more than 20 years. That is no longer equitable.

### i. The 2000 Consent Decree did not remedy any violation of federal law.

For the reasons discussed in Part II.C, above, the District Court abused its discretion in indefinitely extending the 2000 Consent Decree absent any violation of federal law. Those reasons apply with equal force to a then-existing consent decree. Such "a decree may remain in force only as long as it continues to remedy a violation of federal law." *John B.*, 710 F.3d at 398. A court must determine "'whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law.'" *Id.* at 413 (quoting *Horne*, 557 U.S. at 454 ); *see also Cleveland Firefighters*, 669 F.3d at 742 ("And thus the core issue to be resolved in this litigation is whether, 31 years out, the decree's racial classifications continue to remedy past discrimination by the Fire Department.").

Like the 2023 Decree, the vast majority of the restrictions and obligations of the 2000 Consent Decree fell on the Tribes, and the 2000 Consent Decree was never aimed at remedying a violation of federal law, much less one by Sault Tribe. Accordingly, the District Court abused its discretion in indefinitely extending the 2000 Consent Decree, at least with respect to Sault Tribe.

### ii. Sault Tribe had fulfilled any objectives of the 2000 Consent Decree and responsibility for regulating its own Treaty fishing activities should have been returned to it.

For the same reasons discussed in Parts II.B and II.D above, the District Court abused its discretion by indefinitely extending the 2000 Consent Decree

when it did not further the objectives of the 1836 Treaty on which the complaint in this case was based and when it improperly deprived Sault Tribe of its legislative and executive powers. Like the 2023 Decree, the 2000 Consent Decree did not further rights Sault Tribe reserved under the Treaty. Rather, it significantly restricted them. Moreover, the 2000 Consent Decree contained no specific objectives that had to be met by its expiration date. Sault Tribe agreed to those restrictions in 2000 and abided by those restrictions for more than 20 years. But it did not agree to compromise its rights any longer than that. The District Court abused its discretion by indefinitely extending the 2000 Consent Decree, rather than returning to Sault Tribe the responsibility of making its own policy decisions and regulating its own Treaty fishing activities.

## CONCLUSION

The District Court erred by entering the 2023 Decree, regardless of whether the 2023 Decree is reviewed as a permanent injunction or as a consent decree. Given the 2023 Decree's injunctive nature without any proven basis for injunctive relief, this Court should reverse the District Court's entry of the 2023 Decree for abuse of discretion and remand for further proceedings consistent with the requirements of a request for permanent injunctive relief. Alternatively, if the 2023 Decree is viewed (generously) as a "consent" decree despite Sault Tribe's lack of consent, this Court should reverse and remand for adjudication on the merits of

Sault Tribe's objections to it, applying the standard for injunctive relief. This relief is required to honor the Treaty and properly respect Sault Tribe's sovereign Treaty rights.

The District Court also abused its discretion by indefinitely extending the 2000 Consent Decree contrary to law and its unambiguous terms. In the interest of judicial efficiency, this Court should reverse the District Court's Order indefinitely extending the 2000 Consent Decree and find that the 2000 Consent Decree is expired according to its terms.

On remand, the District Court should only lend its judicial imprimatur to any agreements between the parties if they meet applicable legal standards, including, without limitation, those discussed above.


Respectfully Submitted,


*/s/ Ryan J. Mills*
Ryan J. Mills
Sault Ste. Marie Tribe of Chippewa Indians
523 Ashmun St.
Sault Ste. Marie, MI 49783
906-635-6050
Email: rmills@saulttribe.net

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,539 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Ryan J. Mills*
Ryan J. Mills
Attorney at Law
Sault Ste. Marie Tribe of Chippewa Indians
523 Ashmun St.
Sault Ste. Marie, MI 49783
906-635-6050
Email: rmills@saulttribe.net

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of April 2024, a copy of the foregoing was served on all parties or their counsel of record via the Court's Electronic Case Filing System.

*/s/ Ryan J. Mills*

# ADDENDUM

Pursuant to Sixth Circuit Rules 28 and 30, Sault Tribe designates the following

relevant docket entries from the record of the District Court proceedings below.

Additional relevant docket entries that pre-date the electronic filing system are

included in Sault Tribe's Appendix, ECF No. 29.

| Record Entry | Description | Page ID # |
|---|---|---|
| 1371 | Order [Allowing Little River's Intervention | 4226-4229 |
| 1412 | Order [Allowing Little Traverse's Intervention] | 3988-3991 |
| 1416 | Joint Status Report | 3720-3943 |
| 1419 | Little Traverse Notice Pleading | 3691-3714 |
| 1420 | Three Tribes' Request for Relief | 3685-3690 |
| 1422 | Grand Traverse Statement | 3675-3679 |
| 1423 | State's Notice Pleading | 3655-3674 |
| 1424 | U.S. Amended Request for Relief | 3650-3654 |
| 1441 | [Scheduling] Order | 3554-3559 |
| 1458 | 2000 Consent Decree | 3216-3400 |
| 1880 | [6-Party] Joint Brief in Support of Motion to Extend [2000 Consent Decree] | 10668-10673 |
| 1882 | Sault Tribe Motion to Extend 2000 Consent Decree | 10677-10678 |
| 1887 | [Sault Tribe Opposition to Motion to Extend] | 10767-10775 |
| 1892 | Opinion & Order [Extending 2000 Consent Decree] | 10818-10825 |
| 1903 | Order [Extending 2000 Consent Decree] | 10843-10844 |
| 1912 | Order [Extending 2000 Consent Decree] | 10858-10859 |

| 1945 | Order [Extending 2000 Consent Decree] | 10909-10911 |
| 1963 | Order [Extending 2000 Consent Decree] | 10934-10935 |
| 2006 | Sault Tribe Motion to Extend 2000 Consent Decree | 11925-11927 |
| 2012 | Sault Tribe Opposition to United States' Motion to Extend Decree | 11941-11946 |
| 2014 | Order Extending [2000 Consent Decree] | 11957-11958 |
| 2025 | [6-Party] Motion and Memorandum to Extend [2000 Consent Decree Indefinitely | 12013-12017 |
| 2026 | Certificate Regarding Motion Concurrence | 12018-12019 |
| 2027 | Order [Indefinitely Extending 2000 Consent Decree] | 12020-12022 |
| 2042 | [6-Party] Stipulation for Entry of Proposed Decree | 12161-12166 |
| 2046 | Sault Tribe Motion [for Reconsideration] | 12360-12363 |
| 2047 | Sault Tribe Brief in Support of Motion [for Reconsideration] | 12369-12386 |
| 2053 | Amended Scheduling Order | 12395-12396 |
| 2062 | CPMR Objections to Proposed Decree | 12499-12534 |
| 2077 | Sault Tribe Objections to Proposed Decree | 12804-12823 |
| 2078 | Sault Tribe Motion for a FRCP 16 Pretrial Conference, etc. | 12824-12829 |
| 2079 | Notice of Hearing | 12857 |
| 2106 | Order [re: Objections Hearing] | 14332-14351 |
| 2114 | Order Following Objections Hearing | 14375-14378 |
| 2119 | Transcript of 5/24/23 Hearing | 14413-14625 |
| 2120 | Transcript of 5/25/23 Hearing | 14626-14821 |
| 2130 | Opinion [re: 2023 Decree] | 15095-15233 |

| 2131 | Order Adopting the [2023 Decree] | 15234-15235 |
|------|----------------------------------|-------------|
| 2132 | 2023 Decree | 15236-15301 |
| 2138 | Notice of Appeal | 15381-15383 |